oral argument, 15 minutes per side. Mr. Nelson for the appellant. Good morning. I'm Paul Nelson on behalf of Donald Allen and I'd like to reserve four minutes for rebuttal. That's fine. There are only two issues that have been raised on this appeal. It's basically one of them from the beginning of the case and one at the end of the case. What I'd like to do is address those in reverse order. With regard to the sentencing issue, I'd like to address that rather briefly. The government has conceded that the advisory guideline range was improperly calculated at sentencing because an enhancement was applied that should not have been applied. The government appears to be requesting a general remand so an additional enhancement could be applied on resentencing. It's our position that the government has waived that. Having gone through, had I think six or seven opportunities to raise that issue during the district court proceedings or filing a notice of appeal or cross appeal and it failed to do so. At the sentencing itself, the government advocated for the guideline range and the guideline calculations that were conducted by the probation officer. After that time, there were no objections even though it was given several opportunities to do so. Mr. Nelson, as you know, it comes up a lot as to whether what we did was a general remand or a limited remand. I don't remember ever having had a case where the question of what the remand should be came up in the front end. What is the standard that you think were to follow in determining whether it should be general or limited? Or is that purely a matter of our discretion? I think it generally is a matter of your discretion. Although, particularly in this case, and I have to admit that I've been on the other side of this issue where I've been representing in this court a defendant whose district court counsel has not addressed certain issues and in many occasions have not had an opportunity, have lost the opportunity to argue in this court because the issue was not raised. And here it's not simply an issue of failing to raise an objection, failing to impose an objection, interpose an objection at the district court. Here the government first specifically adopted the guideline calculation the court relied on and had numerous opportunities, again, did not object to the initial pre-sentence report. The final pre-sentence report was not, in the sentencing memo, was not addressed at sentencing. And the judge here did ask the Bostic question at the conclusion of sentencing, and the government specifically said. So I think the court should exercise its discretion at this point and remand solely on the issue of this four-level enhancement. Would another way of looking at it be to find out from Mr. Hurley why they did what they did at the lower court? And if it was just a mistake and they screwed up, that might be one result. But if they intentionally took this course of action and now are trying to change the course of action, that might be a different conclusion. Would that be fair? Certainly not going to suggest that the court shouldn't ask the government for its rationale for doing what it did or not doing what it didn't do. But, again, I think that should be weighed. It's easy after the fact to come back and say, this is why we did what we did or why we didn't object at that time, when the record is pretty clear that the government did. And, in fact, there was some discussion at the beginning of sentencing dealing with the whole issue of grouping and so on, where the government did say it's not just conceded, the government advocated for that. So I think, obviously, the court has the option of inquiring of the government, trying to get some background on this, but ultimately— It's safe to say, Mr. Nelson, you and I have had a lot of cases together. Yes, Your Honor. And you oftentimes come up with things, maybe always come up with things that weren't raised below, and sometimes you get away with it and sometimes you don't. Would that be correct? That's a fair statement, Your Honor. I've often said I wish people would ask me before they go into sentencing. I'd regret it probably. It's not like I don't have enough things to do, but on the other hand, I hate coming up with what I think is a really good issue and finding out it's been waived because it wasn't raised in the court below. On the right to privacy, if we assume that he had a right to privacy in the bedroom, then it seems to me the key issues are, was the search of the backpack in the camcorder within the consent of the person that owned the property and or would have been discovered anyway. Well, I think in the cases that we cited in our letter brief where it talks about this, that even assuming, and I think the argument was made in the district court, that even assuming that the search of the bedroom itself was proper or not improper, I guess, that looking through particularly the camcorder, and I think the Riley case made clear that they can't look at the phones. They can't just open those up and look at them. I think it's somewhat disingenuous to be arguing, well, we had to look at the camera to determine who it belonged to. Is there anything that says you can't open a phone to see if there's some identification as to whose it is, as opposed, for example, to opening some of the apps on the phone that might have something that's private in it? I think there's a line probably specifically not that you can't just open it up and see immediately what's on there, but on the other hand, as far as this, this was not simply a case of opening the camera and looking at it. Although the detective who did look at the video on the camera said he only spent a couple of minutes looking at it, that his testimony was that he fast-forwarded through a lot. The whole process maybe took a couple of minutes, but he fast-forwarded through a lot. I think particularly in the context of this case where, although one of the officers did state that they were not participating in an eviction process here, that what Ms. Hindy wanted the police to do was just get everything that was his out of there. Particularly under the circumstances of this case, that there's no sort of exigent circumstances. There's no other excuse for doing what they did. Ms. Hindy, although apparently when the search was conducted, she was still in custody. I think even when she gave her consent, that it was just a few hours after she was stopped for being really, I don't think the record shows what her blood alcohol level was, but under the circumstances, the way she was driving and the fact that she couldn't stand up makes it likely that she was extremely drunk. Probably the next morning, she was still probably quite intoxicated. Just this consent, and I noted today, and it's probably at least partially my fault, that the actual consent document is not part of the record. It was not introduced in the district court, so it was just the officer's testimony about what they did and what the scope of their consent was, but she wanted them to go in and get his stuff out of there. Am I right that about two weeks after the search pursuant to consent, that Ms. Hindy turned over a couple of laptops to law enforcement? I think it was even a shorter period of time than that. I thought it was just maybe two days. Maybe two days, okay. But whatever was subsequent to that. On at least one of those laptops, if I'm right, either the same video that was on the video camera or other videos, but I think maybe the same video of Jennifer Nelson was on one of those laptops. So law enforcement would have, if that's the case, law enforcement would have obtained that video or did obtain that video outside the consent search. Am I right about that at all? The search of the laptops, and in fact I thought it was somewhat noteworthy that the government obtained a search warrant to search the laptops after she turned them over. And the search warrant affidavit, the most significant information in the affidavit that was submitted to the state district court to get the search warrant was the fact that this is what I saw when I looked at the camcorder. Okay, but I'm talking about the one or two laptops that were turned over maybe two days later. Yes, but those, again, the police recognized or the government, whoever was prosecuting the case at that time involved in the case, realized that a search warrant was necessary to look at those laptops. And that's part of the, I think that in terms of the inevitable discovery issue, that the warrant that they obtained was based on what we believe, what our position is was illegally obtained evidence by looking at the camcorder. You say if you delete that from the warrant request, what they saw on the camcorder, there wouldn't have been probable cause to get the warrant to search the laptop? I don't believe so, Your Honor. Other than that, all it was were just Ms. Hindy's statements about what she thought they were doing, that she had no real information. It's just her suspicion of the fact that he was selling marijuana from that room, that he was... But don't we have another independent source? Isn't the search of Mr. Allen's sister's home and maybe the pawn shop information, weren't those obtained on the basis of the statements of the victims and then would be completely independent and inevitably discovered also? Well, I think, but everything flows from the search of the camcorder. Well, but my question is everything that's on the computers and even on the camcorders and the cameras, but didn't victims independently give a statement to the police that resulted in a warrant issued for Mr. Allen's sister's home at which many of the same images were found either in a storage unit and maybe in that camera that was at a pawn shop? Don't we have an independent evidentiary discovery? Well, I think that it's not independent in the sense that everything is the fruit of the poisonous tree of looking at the camcorder. Without that information, I don't think there's any indication that any of this would have happened. But if Ms. Nelson and who's the other woman? I'm sorry. Her name begins with an M. The two young victims told their stories to the police, and my understanding was it was their statements to the police about what had happened to them that resulted in the warrant of Mr. Allen's sister's home and then led to the camera that he had pawned. Isn't that an independent source of the same evidentiary proof that was obtained from the computers? Well, I don't believe that's independent, Your Honor. I think because the authorities would not have gotten to that point but for looking at the camcorder the first time. That up until then, the only contraband they had was an Altoid box with marijuana in it. Judge Trantz is asking you to focus on these two victim statements, one of which was Nelson. Nelson had already told the police that she's a prostitute and presumably under the control of Allen. So while there might or might not have been something about the camcorder and the affidavit, why isn't, as Judge Trantz is asking you, the victim statements enough to have gotten the warrant to search the storage unit and the sister's house? Why did they need the camcorder video for that? Because at least as far as the child pornography account is concerned, the child pornography information, that that is what led to all of this. All right, I understand. And so I think it would still be necessary, if at all, to review all of this and sort of set up some sort of flow chart to determine if that was illegal, which we believe it was, it was an improper search, that what did that lead to. Okay, thank you. You will have your rebuttal time. Good morning, Your Honors. My name is Dan Hurley and I represent the United States. This court said in United States v. Castelli, it's 308 F. 3rd at page 575, that you set aside the tainted portion, or in this case, what is allegedly tainted, and if there is probable cause independent of that, then the search is upheld. And in this case, as Judge Trantz was pointing out, if nothing else, the affidavit supporting the search of Mr. Allen's sister's house is based almost exclusively on the statements from the two victims. And therefore, that search warrant stands. I don't know of any court that has ever accepted Mr. Nelson's suggestion that if there's any taint at any point, everything downstream is there for illegally obtained evidence. Here, the police were investigating a 17-year-old who told them she was working for Mr. Nelson. She was listed on the police report as working for Mr. Nelson as a prostitute. I'm sorry, Mr. Allen as a prostitute. So the suggestion that nothing would have happened if they hadn't seen these pictures I think is just, there's no basis for that. This was a 17-year-old working as a prostitute. The affidavit that the officers sought in state court two days later specifically listed pandering and promoting prostitution as among the charges that were under investigation. In addition to that, they were drug officers, and Mr. Allen was repeated to be selling marijuana out of Ms. Hindy's condominium. They brought a drug dog. They found a small amount of marijuana. And so there's nothing to think that this all would have gone away if not for seeing the pictures of Ms. Nelson on that camcorder. So why should you get another shot at a different guideline calculation if you endorse the recommendation in the PSR at the original sentencing? I think it's up to the court's discretion whether or not it's a general remand or a limited remand. I think that in this case we did not waive anything because waiver is the knowing relinquishment. I don't have a good answer for why the guidelines were done wrong in so many ways other than I think the probation officer, the court, and the AUSA, none of them had the experience to understand how these guidelines work together. I think the argument for a general remand is twofold. One, that is the court's general practice. The guidelines area in particular, it's important to keep in mind how interconnected they are. And so, for example, this is a four-level increase that's at stake. That's the specific issue here. It is not okay to just send it back and say subtract four from that guideline range. And the reason is the grouping counts change because it's a 36 and a 30, and so there was only one and a half units. If you subtract four, now there's two units. So there's actually only three levels in play, even if you only focus on the four level. That I figured out, but usually the parties don't know in advance exactly how the guidelines might change if you only focus on the specific enhancement. So as a general matter, the court's not able to say if the defendant is right, minus three, minus four, whatever. They're too interconnected. And so in these circumstances, I think that a general remand is the appropriate relief. We had a strategic decision to make. Do we front for the court and, frankly, for Mr. Allen that we think there are a number of errors, or do we sit on it? We could have said nothing, wait until we get to resentencing, and then say, by the way, Judge O'Meara, here's all these other guideline issues, and the law is absolutely clear that on a general remand, that is within our prerogative. And Judge O'Meara could hear all of our arguments, could agree with us, and could find Mr. Allen's guidelines significantly higher. And this court has affirmed cases when that happens. If that's the preferred... I would have to explain why, in addition to all of the listed times you failed to raise it below, as your opposing counsel has said, then why you failed to raise it before us. I'm sorry, could you... You would have even further evidence of waiver if you wait until the very end. I don't think that's waiver, Your Honor. I think that's forfeiture. If this court wants to say that failure to make an argument at a certain number of junctures is waiver, frankly, I think the government would be happy with that rule. But under the case law... It comes up on both sides a lot of times. The case law is pretty clear that that's forfeiture. And do you think that you have forfeited the inevitable discovery doctrine argument by failing to raise that? We didn't raise it, but this court is free to affirm on any ground. And there's an untold number of cases that make that point. And so that is something that we did not raise it. I don't think we need it. But if the court chooses to resolve it on that basis, the law is clear that that is absolutely within your prerogative. And the court invited us to submit a brief, so we did. And your primary argument is that we use the doctrine of deleting the information from the warrant that's inappropriate, and the warrant still stands. Is that your best argument for why you should win? I think our best argument is apparent authority. Hindy told the police that she had retained full access to the entire condominium. Nothing about renting was said. She said he'd been there for two weeks. The district court found that it was two weeks. He's sleeping on an air mattress. His clothes are in duffel bags. Nothing is in the dressers that appears to belong to Mr. Allen. The police go there. There's some authority that says when a place is your home, no matter how transient it is as your home, it is still the castle of the individual and should be protected. There is, Your Honor. The district court made a finding that the way Mr. Allen used his space vitiated that expectation of privacy, that he didn't manifest it himself. Whether or not society is otherwise prepared to recognize it as his castle, the district court's finding was that Mr. Allen, in the way he used his space for commercial purposes, he had not manifested it, and so under the first prong of Katz, his claim doesn't have merit. I'm not resting on that today. I'm saying that even if he had a reasonable expectation of privacy, Hindy had actual and apparent authority to consent to a search of that space because she retained full access to the entirety of the condominium. Under actual or apparent authority, then, she also has the authority, when she tells the police that she thinks there are drugs there, they can look in containers, right? Now, containers seems to me to sort of address itself to the backpack, but Mr. Nelson's complaining about the backpack. I can't figure out what the relevance is of the backpack. Was something found in it that then appeared in an affidavit or something? One of the two laptops was in the backpack. The laptop was there? Yes. Okay. But although I believe there was some video from those two laptops played at trial, I'm still not sure exactly what evidence is in dispute, but as I understand it, it's really the video files from the camcorder, which was found on the nightstand or the table, and then the second round, two days later, when Hindy calls and says, there's two more laptops, one's in the kitchen, one's somewhere else in the unit. It's not clear where, which bedroom it was. That's where the trial evidence came from, in addition to the other laptop found two years later at Allen's sister's house. But isn't opening the camera and viewing and fast-forwarding through the films on it a different issue? I don't think so, Your Honor, for two reasons. One, I don't think a camcorder equals a cell phone. I think a camcorder, for all the reasons in Riley that the Supreme Court said cell phones are different, cell phones are special, because they have so much, they have your calendar, they have your location information, they have your photos, your contacts, your e-mails. This is just a digital picture book. A camcorder is like a photo album, and I think that Hindy had authority. She had the ability to view it. It was out in the open. There was nothing to secure it. It wasn't tucked away in a box inside the closet among his stuff. It's out on the table. And Hindy is certainly free to view whatever is on the camcorder, and therefore she is free to give the police the authority to do that. I don't think it counts as a search, because if there had been a picture book, Alan's summer trip to wherever, could the police have flipped it open? And I think the answer is absolutely. I think the camcorder is more akin... You don't think that the videos that an individual films on the camera partakes of a privacy interest? I mean, isn't that every bit as personal as what's on a telephone? Because it is what an individual has chosen to film. And on this one, it sure did have a bunch of private stuff on it. I understand it wasn't Mr. Allen's private stuff. It was the 17-year-old's, but I don't... Well, it was Mr. Allen's, because it's the basis of your charging him with the illegalities that he engaged in. It was one of multiple bases. And I'm not saying that there's no interest there. I'm saying two things. One, I don't think looking at the camcorder to identify who owns it counts as a search under Riley. And even if it does... I'm struggling a little bit with the decision or the statement that opening up a camera and viewing what's on it could in any way be for the purpose of determining who owns it. Are you saying I opened it up and I saw this 17-year-old saying, I'm 17, and then naked in later pictures means that it's her camera because she must have authorized someone to film her? I mean, how does that give you any information about who owns it? I think what it tells you is it's not Hindy's camera, Your Honor. If it showed an Asian woman, if it showed her relatives, her family, then I think the officers conclude this is Hindy's and there's no reason to take that. If instead it shows Allen or it shows minor females engaging in sexual explicit conduct or other videos about prostitution or the minor female at a local casino, which is some of the other video evidence, then it does tell them this is Allen's and this is part of what Hindy has asked them to take because she told them it is likely to have evidence of child exploitation. She told them he's prostituting her, he's taking photographs, he's creating visual depictions to make advertisements for prostitution. We know that because he asked Hindy to be in some of those advertisements. He's posting them in local underground newspapers, Metro Times, and things of that sort. The police knew all of that, and so if it's Hindy's camera, there's no point in taking it, and if it's Allen's camera, then there is a reason to take it and there's absolutely independent and sufficient probable cause to take the camera, get a search warrant, and pursue it as a line. What's your best case for the authority to open up the camera and view the videos on it? I think if nothing else, Your Honor, it's within the apparent authority doctrine that Hindy... Is there any case that addresses the camera particularly in the apparent authority doctrine? I'm sorry, I don't mean to interrupt you, but I'm not aware of a case that specifically says whether a video camera is within or without the apparent authority. The apparent authority doctrine generally says whatever Hindy has access to, she can confer that on the officers, and that's what she did here. She told them, she didn't say take my stuff, leave my stuff, take his stuff, and you're free to look in his stuff for evidence of these crimes. And so when they go there... Is that in the written consent document? I don't believe they got into the level of detail. I think it was just a general consent form, but it's important to remember she actually approached the officers to go search. They weren't squeezing the girlfriend at the scene where the defendant's in the back of the squad car. She approached the police and said, I want you to go get his stuff out. I want you to go find evidence. I'm telling you he's doing these bad things. I don't want it to continue in my apartment, and I don't want it to continue at all, so please go get his stuff and use it as evidence against him. And so I think in doing so, she was conferring her authority, actual or apparent, on the officers. So even if the court decides looking at the camcorder counts as a search, so is looking in the bedroom, so is looking in the backpack. If she has the authority to do so, she is free to confer that on the officers, and that's what happened here. And there's nothing that the officers encountered that told them this is outside the scope of what she could do. This court has cases where if the officers find things or learn facts that are inconsistent with the authority that they believe they were operating under, then they have an obligation to stop and confirm, is this actually within the scope of the common authority? Here, everything the officers encountered was consistent with what Hindy had told them, that she had full access, the door wasn't locked, her stuff was still in the closet, her stuff was in the dresser drawer. So a reasonable officer in those circumstances believes they're doing exactly what Hindy is allowed to do, and if there's an electronic device on a table, if she can press play, so can they. And that's all that happened here. Unless the court has any further questions, we're prepared to rest in our briefs, as I see that my time is up. Okay. Thank you, Mr. Early. Thank you. Thank you, Juan. Hopefully I won't jump around too much here. With regard to the question of the sentencing issue, and there was a comment that this is a grouping issue that would have to be revisited if there's resentencing. And I just point out, page 7, I believe, of the sentencing transcript, the government, there was a discussion about grouping, and the government also adopted the grouping that was reflected in the final pre-sentence report, specifically adopted that. I think that it is. Mr. Early is arguing that the grouping can change now if you simply, if you delete that enhancement. Well, and that. Isn't that true? Yes. Doesn't the court at least have to readdress the grouping issue? Isn't that just a natural consequence of reversal on the other sentencing year? Yes, and that would have to happen. Is there something else that you don't want the judge to be able to do, assuming that he does revisit the grouping? Well, I think that the government should not be allowed to come in and say, when you did it the first time, the grouping that you did should have been something else other than what we agreed to. My point is, if you have to revisit grouping, isn't it only appropriate to then have the judge do it correctly, whatever that is? It would do it correctly based on the deletion of that four-level enhancement, which according to my calculations, and I think they agree that the grouping would change somewhat, but the ultimate end would be that the advisory guideline range, I think would be 235 to 294, which is below the sentence that he got. So if you don't want them, if you agree they have to revisit grouping in some respect, what do you want the court to be precluded from doing in resentencing? The court should only recalculate the grouping based on the fact that that four-level enhancement is. . . But that's not telling me what they shouldn't be able to do. They shouldn't be able to start again from scratch. What beyond that do you think the government is going to ask them to do that you want the remand to prevent them from doing? I think the government, although I'm still a little bit unclear from the government's brief in terms of how this grouping would work, but basically that no additional enhancements, because I think the enhancement that they're talking about is an enhancement that would be applied after all the grouping and after everything else is calculated. You want us to restrict them from doing something that you're not even sure what they might do? Yes. Well, this five-level enhancement that they're talking about, they should not be allowed to advocate to have that applied on remand. As far as the suppression issue is concerned, and again, without seeing and assuming it was just a general consent to search, I'm not sure that a consent to search for some sort of contraband, that if the court looks at her affidavit or the affidavit for the search warrant and what the testimony was about what she said, it's all, I think, I believe that all of this suspicion, she has no actual facts and there's nothing that's corroborated about her suspicions in advance of this illegal search of the camcorder. And maybe they can go through if they're looking for, and I think... I don't understand that. They pick the three of them up in the car. The woman admits she's a minor and she's a prostitute, and she either admits she's working for Allen or it's pretty clear from the circumstances that she is. I don't understand how we say they didn't know anything. And then Hindy tells them what she told them. It's a pretty complete picture, wasn't it? Well, I think that does not allow, I mean, there's nothing in the record that she didn't say that he's taking videos of me or any of these kind of things. So the fact that there's a camcorder in there, and I would dispute the fact that, number one, that Ms. Hindy had the authority to go in and she can just look at it if she wants. If she's acting as doing that in the private capacity, maybe, but if she's doing it as an agent of the police, it would not put this in any better position. But still we would, again, obviously I'm out of time, but I think as far as the search is concerned that I would agree with your comments or what I understood your comments to be, Judge Stranch, that a camcorder these days, I mean, the video could be on a phone, and when you look at Riley and they talk about all the reasons why a cell phone, a search warrant is required to look at the cell phone, all of that would apply here. Is that your best authority for distinguishing a camcorder from a picture book and analogizing it to a cell phone? Well, that, and also, I mean, I personally, I guess I, luckily as far as I know, maybe I have to go back and look at albums, and we've got boxes of photographs from vacations and so on. I'm not sure that the police could just come in and rummage through our photo books, our photo albums or anything like that. Are there any cases that support your argument about a camcorder being the functional equivalent of a cell phone? No, not that I could find, but thank you. Okay, thank you, counsel, for your arguments today. We do appreciate them. The case will be submitted. We may call the next case.